UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.:

JENNIFER ARTEAGA,

               Plaintiff,

v.

DUTY FREE RETAIL GROUP LLC and
SANFREE OF MIAMI, LLC d/b/a ONI
ESSENCE,

          Defendants.

## COMPLAINT

Plaintiff JENNIFER ARTEAGA ("Plaintiff") sues defendants DUTY FREE RETAIL GROUP LLC and SANFREE OF MIAMI, LLC d/b/a ONI ESSENCE (collectively, "Defendants") and alleges as follows:

## NATURE OF ACTION

This action arises out of Plaintiff's employment relationship with Defendants, including her discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 USC § 2000e *et seq.*; and the Florida Civil Rights Act of 1992, Fla. Stat. § 760 *et seq.* ("FCRA").

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action under 42 U.S.C. § 2000e-5(f), and 28 U.S.C. §§ 1331, 1343(3) and (4) and 1367 (a).

2.     Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391, because Defendants reside in this district; also, because Defendants are subject to the Court's personal jurisdiction with respect to the civil action at bar

and because all or a substantial part of the events or omissions giving rise to this cause of action took place in this judicial district.

3.     Plaintiff also invokes the supplemental jurisdiction of this Court to hear and decide claims arising under the laws of the State of Florida that are so related to claims in the action within the original jurisdiction of this district Court that they form part of the same case or controversy under Article III of the United States Constitution. In particular, Plaintiff is bringing claims under the FCRA.

## PARTIES

4.     At all times material, Plaintiff was a resident of Miami-Dade County, Florida.

5.     At all times material, Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f).

6.     At all times material hereto, Plaintiff was an "aggrieved person" as defined by the FCRA, Fla. Stat. § 760.02(10).

7.     Defendants are headquartered Miami, Florida, and conduct business throughout the United States of America. Defendants are Florida companies, having their main place of business in Miami-Dade County, Florida, where Plaintiff worked for Defendants, acting as a single employer, and at all times material hereto were and are engaged in interstate commerce. Specifically, Defendants have their main business office at 6135 NW 167th St # E 10 and E 14 (respectively), Hialeah, FL 33015. Plaintiff used to work at 6135 NW 167th St., E 14, Miami, FL 33015.

8.     At all times material, Defendants were a "person" and an "employer" as defined by 42 U.S.C. § 2000e (a) and (b) and Fla. Stat. § 760.02(7). Defendants employed fifteen or

more employees for the applicable statutory period and therefore they are subject to the employment discrimination provisions of the applicable statutes – Title VII and the FCRA.

## PROCEDURAL REQUIREMENTS

9.    Plaintiff has complied with all conditions precedent in filing this action, to wit:

a.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Miami District Office, for sex discrimination and retaliation.

b.    On October 17, 2019, Plaintiff received a Right to Sue Notice from the EEOC that was dated October 15, 2019.

c.    More than 180 days have transpired since Plaintiff filed her charge of discrimination.

10.    Any other applicable conditions precedent to bringing this action have occurred, been performed or been excused before the filing of this lawsuit.

## GENERAL ALLEGATIONS

11.    Plaintiff is a female who on June 25th, 2018, started working for Defendant DUTY FREE RETAIL GROUP LLC ("Duty Free"), holding a position of Administrative Assistant.

12.    Duty Free and Defendant SANFREE OF MIAMI, LLC d/b/a ONI ESSENCE ("Sanfree") share the same location, the same merchandise and the same employees. The employees of both companies use the same clock to punch in and out and they are paid through the same payroll system. Likewise, the person in charge of Human Resources for one company, Monica Lugo, is the same as for the other.

13.     Moreover, the owners of Duty Free and Sanfree are the same, to wit: Marcos Bordoni ("Bordoni") and Fernando Lupica-Tondo ("Lupica"). Hence, Defendants constitute a single employer, jointly employing more than fifteen (15) employees. Alternatively, the Defendants are joint employers or an agent of one another for purposes of liability under Title VII and the FCRA.

14.     Plaintiff was interviewed and hired for the position of Administrative Assistant by Norberto Lugo ("Lugo"), who was her immediate supervisor and/or direct manager. At the moment that Plaintiff was hired, she did not receive any written policy on sexual discrimination or harassment. In fact, as of the time of her hiring with Defendants, there were no written rules or company norms. Plaintiff did not sign any written employment contract.

15.     During Plaintiff's employment with Defendants, she shared the office space with three other employees of Duty Free, including her immediate supervisor and/or direct manager, Lugo, and two other co-workers named Maryori Perez ("Perez") and Jose Guapacha ("Guapacha").

16.     Since the very beginning of her employment with Defendants, Plaintiff observed that the two male coworkers with whom she shared the office space, to wit, Lugo and Guapacha, were constantly telling blue, dirty jokes.

17.     At first, Plaintiff tried ignoring them and nervously laughed at the jokes, trying to be accepted within the office environment. As the days went by, these dirty jokes became more frequent and more explicit, filled with a lot of sarcasm, innuendo and double meanings with strong sexual undertones. All three of Plaintiff's closest coworkers, including her immediate supervisor, actively engaged in this sort of conduct.

18.     Plaintiff's immediate supervisor and coworkers often openly discussed sexual topics, such as ménages à trois, infidelity, oral sex, the use of condoms, etc., and they would ask Plaintiff for her opinion, with questions like: "Do you like open or closed relationships?" encouraging her to give her opinion. Plaintiff felt extremely uncomfortable with these conversations.

19.     On several occasions, Guapacha directly addressed Plaintiff with remarks plagued with sexual innuendo, such as: "How do you like them - big or small?" in response to observations Plaintiff had made about the size of her desk. If Plaintiff answered that she wanted something of a small size, he would make a joke out of it and he would say something like: "you don't like them big?" or words to that effect.

20.     On other occasions, while they discussed the positions of all four desks, Guapacha made a remark with a sexual innuendo saying: "I like it better on my back."

21.     Furthermore, Guapacha constantly said to Plaintiff: "If you knew how long my appreciation is for you…" with a big smile on his face. He made several remarks with sexual innuendo to other women at the workplace.

22.     Around July of 2018, Plaintiff's immediate supervisor and Guapacha started to invite Plaintiff to go for happy hour on Fridays. Plaintiff declined these invitations on several occasions. Plaintiff's immediate supervisor said that Plaintiff would probably go out with them if she liked either one of them. Lugo inquired if Plaintiff liked him or Guapacha. Because Plaintiff declined their invitations, they started harassing her at work.

23.     On July 27, 2018, Lugo sent Plaintiff a message through WhatsApp that said: "I was going to invite you to have some drinks but: 1. You are very 'fitness' fitness?; 2. You do not

socialize with coworkers, 3. You think I am an alcoholic, 4. I do not know how many more reasons." He also wrote "Jouber [Plaintiff husband's name] is a pussy."

24.     On August 8, 2018, Plaintiff was visibly exhausted as she was moving and at the same time teaching an aerobics class at night. Lugo, Plaintiff's supervisor, while explaining to her how to download an Excel file into her workstation, realized how tired Plaintiff looked and said to her "you need to stop f--king all night." Plaintiff explained to him the real cause for her tiredness. Lugo continued explaining the procedure to download and save the file, and proceeded to save the file under the name "lack of sex."

25.     Plaintiff found this action offensive, objected to the name given to this file, and asked Lugo why he would always have to link everything to sex. His reply was that "everything revolves around that."

26.      On August 15, 2018, a package from Amazon arrived to Plaintiff's workplace, erroneously addressed to "Jennifer Bordoni." As previously stated, Bordoni is the last name of the General Manager and Principal Partner of the company, Marcos Bordoni. Lugo said to Plaintiff: "Wow, Jennifer, I thought operation mattress was left behind in Venezuela! I'm away on vacation for a few days and when I return look how things have changed." With this remark he stated that Plaintiff had slept with the owner of the company. The other two co-workers, Perez and Guapacha, started laughing.

27.     The communication between Lugo, Perez and Guapacha was very obscene; they used foul language, constantly. Additionally, Perez' demeanor was defiant; she spoke with a very loud voice; she cursed and slammed doors, creating a hostile working environment.

28.     On August 20, 2018, at noon time during lunch, Lugo started a conversation with Plaintiff, inquiring about her status with her husband. Plaintiff answered that they were

separated, but that they still helped each other and that they were friends. All of a sudden, Lugo asked Plaintiff: "Why don't you have sex with me?" Plaintiff was shocked and felt uncomfortable, but she kept in mind that he had recruited her, so she tried to remain calm. Then, Lugo began telling Plaintiff about him and his wife, that they had an open relationship, about its benefits and about ménage-a-trois. At that point, Plaintiff could not take it anymore and said to him that she was a classical woman, no open relationships, no ménage-a-trois.

29.     On August 21, 2018, Plaintiff also spoke personally with Lugo and asked him to stop the innuendos and the harassment because she could not take it anymore. His answer was that "this is the culture of the office." He added that Plaintiff had joined a place where that was the culture and that she could not change it.

30.     On August 22, 2018, Lugo sent to Plaintiff another private message with a picture of Plaintiff wearing beach attire, that he grabbed from her Instagram account with a comment that read "this is the way I like them." Plaintiff answered: "You are way off limits" and he replied: "I forgot that our relationship is strictly professional." At that point Plaintiff did not make any complaints, because she was fearful and very nervous. Plaintiff just focused on avoiding problems to keep her job.

31.     On August 23, 2018, Lugo told Plaintiff that he wanted to talk to her in private, and he waited until they were alone in the office to say: "What I'm going to say is not going to change anything in our work relationship, I want to tell you that you are too attractive, and I am very attracted to you. I know you don't pay attention to me, and I want to stop trying on you, but I can't." Plaintiff could not say anything; she blushed and was very nervous. Plaintiff was afraid of losing her job, she did not want to be rude with him, so she said "thank you for your honesty."

32.     On August 27, 2018, Plaintiff's supervisor and her two closest co-workers, to wit, Perez and Guapacha, were mocking her for a defective furniture delivery, and as she protested by saying "I did not choose the furniture, I only placed the purchase order," they told her not to take everything so seriously. Plaintiff then told them: "I am a serious person and you need to stop harassing me." Mr. Lugo said to Plaintiff: "I told you that this is the culture of this office, you have to adapt, or you see what you do." Plaintiff replied: "We are in the United States." From that point on, Plaintiff began to feel worse, as she realized that she was working in a lawless place, with no norms and no respect.

33.     On August 28, 2018, Perez and Guapacha moved the printer from its original place and they put it just behind Plaintiff. The printer made a lot of noise that annoyed Plaintiff and did not allow her to concentrate. Plaintiff thought that this move was done on purpose to upset her and force her to resign.

34.     Plaintiff began taking Ibuprofen and Tylenol every day to alleviate the strong headaches she got from listening to all the sexual innuendos and mockery about homosexuals, sex, and disparaging remarks about black people, about their race. Guapacha told Plaintiff that other women who had worked there before did not last in the position.

35.     On September 16, 2018, Plaintiff removed herself from the WhatsApp group of the office, which was shared by her immediate supervisor, her two closest in-office coworkers at Duty Free and two more employees that are based in Venezuela. Plaintiff was involuntarily included in that group the day after she started working. At the beginning, Plaintiff was told that the purpose of the WhatsApp was to talk about information related to the job and to the office. Plaintiff decided to remove her contact from the WhatsApp group because about 70% of the

conversation consisted of sexual innuendos and blue jokes. Plaintiff decided that she did not need to have more of the same things that happened at work in her personal phone.

36.     Around that same time, Plaintiff asked her immediate supervisor, Lugo, to relocate the printer that was placed just behind Plaintiff because of its constant noise that was causing her a lot of stress. His answer was "no." At this point, all of them were discriminating against Plaintiff because she only spoke to them about work and did not participate in any of their dirty, sexually plagued conversations.

37.     On September 20, 2018, Perez asked Plaintiff to find installers and get a quote for an advertisement that Defendants needed for St. Thomas, U.S.V.I. Plaintiff was asking Perez to explain to her some details about the building and the place where the advertisement was going to be placed and Perez went berserk yelling at Plaintiff. Because of this altercation with Plaintiff, Plaintiff asked Guapacha for help. Guapacha then said that he had sent it to Plaintiff by WhatsApp. When Plaintiff mentioned that she did not have WhatsApp, that was when Plaintiff's closest coworkers realized that she had removed herself from the WhatsApp group. Perez yelled at Plaintiff again, saying that she could not leave the group and questioning why she had left it. Lugo sided with Perez, and verbally reprimanded Plaintiff for not telling him that she had left the group. It should be noted that WhatsApp automatically notifies the remaining members of a group whenever any person leaves the application. Plaintiff felt very upset and nervous at the verbal attack she was being unfairly subjected to.

38.     On October 1, 2018, at the wee hours of the night, Plaintiff finally got enough courage and decided to report the sexual harassment she was enduring to the Human Resources Administrator, Mrs. Monica Lugo. Plaintiff sent to Monica Lugo an email explaining to her the extreme, ongoing sexual innuendos, inappropriate behavior, blue jokes that had turned Plaintiff's

workplace into a hostile work environment. Plaintiff told Ms. Lugo that the hostile work environment was affecting her psychologically, emotionally and physically. Also, Plaintiff told Ms. Lugo that it was taking a toll on Plaintiff's health, and that there was no reason for her to lose sleep on account of this abuse and humiliation in the work place. Additionally, Plaintiff told Ms. Lugo about the most recent incident she experienced at work where her coworkers became angry upon learning that Plaintiff had left the WhatsApp group.

39.     On October 1, 2018, Plaintiff held a private conversation with Ms. Lugo where Ms. Lugo explained to Plaintiff that what she was complaining about were merely jokes that were not meant to be taken too seriously, that she saw it as something normal and that it did not bother her. In response, Plaintiff told Ms. Lugo that companies currently lecture their employees on sexual harassment to avoid liability. It became evident to Plaintiff that Ms. Lugo had no idea of what Plaintiff was talking about.

40.     On October 2, 2018, the email that Plaintiff had sent to Ms. Lugo was forwarded to her three closest coworkers at Duty Free. That day Plaintiff's immediate supervisor and closest coworkers behaved very hostile towards Plaintiff. They slammed the door more often; Perez hit the printer as to intimidate Plaintiff. It was one of Plaintiff's worst days at the office.

41.     On October 3, 2018, one of the partners, Lupica called Plaintiff into his office, and told her that he was already aware of the concerns that Plaintiff had brought up to their attention, that he was surprised about it, but that they were going to take remedial action.

42.     Afterwards, upon returning to her office area, Plaintiff heard Lugo, Plaintiff's immediate supervisor, reading aloud to Guapacha the email that Plaintiff had sent to Ms. Lugo. Plaintiff also heard Guapacha telling Lugo that what Plaintiff had written were not lies.

43.     Later that day, one of Defendants' owners, Bordoni, called Plaintiff to his office. He told Plaintiff that he was aware of the situation, of the email Plaintiff had sent to Ms. Lugo and that after he had read Plaintiff's report, he had consulted his attorneys because it was a serious matter. Then, Bordoni asked Plaintiff to tell him what had happened.

44.     Plaintiff told Bordoni about the sexual harassment and hostile work environment to which Plaintiff had been subjected to from the moment she started working there, how the sexual harassment had changed Plaintiff's working conditions for the worse and the latest incident that Plaintiff had with her closest coworkers and immediate supervisor from Duty Free due to Plaintiff's departure from the WhatsApp group.

45.     Regarding Plaintiff's allegation of sexual harassment, Bordoni said to Plaintiff that his attorneys had advised him to establish anti-harassment and anti-retaliation policies; that he was going to prepare the paperwork for all the employees of the company. Also, Bordoni said that later during the day, he would go over to the office to have a talk and bury the hatchet and reach a compromise. Plaintiff told Bordoni that she did not want that because it would put her in a very difficult and uncomfortable situation. Bordoni, however, insisted that it needed to be done.

46.     Afterwards, Bordoni came into the office to distribute the new policies to all the employees, including Plaintiff, and to sign a paper acknowledging receipt. This was the very first time that Plaintiff saw the policy. Then, Bordoni addressed all the employees as a group and told them that this was the new policy implemented on account of the email that Plaintiff had sent where Plaintiff had denounced a sexual harassment situation. Bordoni also said that later on, Ms. Lugo would meet with the employees to hold a conversation where the employees could express themselves and talk about the issue.

47.     When Ms. Lugo arrived to meet with the employees, after stating that the reason for her presence was to mediate and to facilitate a conversation amongst the employees, Lugo got off his chair and said that Plaintiff's accusation was exaggerated. Perez once again began yelling at Plaintiff, calling Plaintiff a liar, and that she could not work with someone like Plaintiff. Perez reaffirmed her attitude and behavior and stated that she was not going to change. Ms. Lugo did not intervene at all; she failed to protect Plaintiff from this vicious attack. Guapacha was the only one who apologized to Plaintiff at that moment. The others engaged in immediate retaliation against Plaintiff for opposing a toxic and hostile working environment. From that day on, Plaintiff's mental, emotional and physical health deteriorated.

48.     On October 4, 2018, Plaintiff could not go to work because the conditions at work had become so abusive that Plaintiff began to suffer from a lot of anxiety that did not allow her to sleep. At night, Plaintiff sat down and wrote an email to Bordoni, giving him notice of the events that took place the day before and telling him that the new policy against harassment and retaliation was immediately violated by the actions of his employees and by Plaintiff's immediate supervisor.

49.     On Friday, October 5th, again in the wee hours, Plaintiff sent another email to Bordoni giving him notice of the events of sexual harassment that Plaintiff endured during late July, August and September, 2018, at the hands of her immediate supervisor Lugo. Plaintiff attached some of the documents that she had as evidence of the unwanted sexual advances that he did towards her.

50.     When Plaintiff returned to work on October 5, 2018, she found out that she had been given more work to do, adding tasks that she had not done before, even asking her to produce analysis of inventory, when her position as administrative assistant was strictly clerical

and did not entail typical tasks of an analyst. Moreover, Plaintiff noticed that Lugo and Perez continued making blue jokes, making more innuendos and laughing louder. At that moment, Plaintiff started looking for a psychiatrist to deal with the anxiety that the hostile work environment was having upon her.

51.     On October 10, 2018, once again Plaintiff notified by means of an email sent to Defendants' owners, Bordoni and Lupica, that Plaintiff was being assigned new duties that she had never done before without giving her the benefit of training or any instruction as to how to do them. On that email Plaintiff told them that these new tasks were done just after she had reported the sexual harassment and hostile work environment that pervaded at the office. Plaintiff underscored that she wanted to keep working for the company and do her best, following instructions and abiding by the policies set forth to keep a healthy work environment, but that Perez' attitude towards Plaintiff and the assignment of new duties without providing any guidelines were not making that possible. Plaintiff highlighted that this created a hostile work environment and that it was obvious that Perez was committing retaliatory actions against Plaintiff because on October 1, 2018, Plaintiff had reported acts of sexual harassment. Also, Plaintiff asked when they would move the printer behind her and told them that its noise did not allow her to concentrate.

52.     On October 13, 2018, Plaintiff sent an email to Ms. Lugo and copied Defendants' owners, Bordoni and Lupica, notifying them that the sexual innuendos, sexual remarks and sexual harassment continued taking place at work, despite the fact that the employees had signed an anti-harassment and anti-retaliation policy. In addition, Plaintiff restated her position that the assignment of new duties for which she had no training or knowledge was done in retaliation for having opposed the hostile work environment of which she was being a victim. Plaintiff told

them in that email of October 13, that she felt disappointed at their instruction of addressing her concerns to her immediate supervisor who was her harasser and that she could not feel comfortable talking with him about anything.

53.     Additionally, Plaintiff said to Ms. Lugo and to Defendants' owners that she did not see what measures they were taking to solve the hostile work environment, sexual harassment and the ensuing retaliation that she was now enduring. Plaintiff felt that her employer was against her and in favor of her harasser.

54.     On October 15, 2018, Plaintiff was finally able to see a psychiatrist. After Plaintiff described to him the crisis that she had been going through at work and examining her, the psychiatrist diagnosed Plaintiff with generalized anxiety disorder (GAD). The doctor prescribed a medication that Plaintiff started taking right away.

55.     Notwithstanding Plaintiff's complaints to Defendants' decision makers, Bordoni, Lupica, and to Ms. Monica Lugo who was in charge of Human Resources, Plaintiff's immediate supervisor and coworkers continued perpetuating the hostile work environment, by means of sexual innuendos, blue jokes, derogatory remarks, laughing at her, and humiliating her, all day long.

56.     Defendants' decision makers, Bordoni and Lupica, ceased from answering Plaintiff's emails; in fact, they behaved as if nothing was happening. Moreover, instead of relocating the printer, they left it where it was, right behind Plaintiff, in a blatant maneuver to torture Plaintiff. Ms. Lugo went as far as disclaiming any relationship with Duty Free, saying that she worked for another company, despite that she was the one who conducted the infamous meeting where all the harassers ganged up against Plaintiff. Without any grounds, Ms. Lugo also dared to impute Plaintiff with creating a hostile work environment.

14

57.     Throughout this time, Plaintiff continued to be retaliated against by her immediate supervisor, Lugo. Lugo kept on assigning Plaintiff more and more new duties, of which Plaintiff lacked knowledge and/or training. Because of management's instructions, Plaintiff had to keep communicating with Lugo to do her job despite her complaints of sexual harassment and management awareness of these.

58.     On October 26, 2018, Ms. Monica Lugo went to the office area of Duty Free and showed to the employees, including Plaintiff, a video on a laptop about sexual harassment. The video was representative of the events that Plaintiff has been exposed to at this job. Shortly thereafter, Ms. Lugo handed to each one of the employees assigned to work for Duty Free a document that contained the results of a perfunctory investigation conducted by management of Plaintiff's claim of sexual harassment. The outcome of this investigation was that it was inconclusive and consequently, that they were not able to take any corrective measure. Plaintiff felt frustrated and betrayed.

59.     In yet another act of retaliation, Bordoni joined the humiliation that Plaintiff had been already suffering when he said to Plaintiff in front of the other employees to move to a corner if she did not want to hear the noise of the printer anymore, or to wear ear plugs.

60.     Plaintiff endured a great deal of stress and felt that she was working in a very hostile, gender discriminating, environment.

61.     On November 19, 2018, after dealing for several months with intolerable working conditions and feeling unable to continue suffering the ongoing sexual harassment and discrimination at her workplace, Plaintiff took the difficult decision of resigning from her job.

**COUNT I:**
**VIOLATION OF TITLE VII BY DEFENDANTS –**
**HOSTILE WORK ENVIRONMENT**

62.     Plaintiff repeats and re-alleges paragraphs 1 – 61 as if fully stated herein.

63.     At all times material to this action, Defendants engaged in unlawful discrimination against Plaintiff due to her gender, in violation of Title VII.

64.     At all times material, Defendants were aware of the ongoing hostile work environment to which Plaintiff was being subjected.

65.     Because of this hostile work environment, Plaintiff has been deprived of equal employment opportunities, specifically her employment, because of her gender.

66.     As a direct and proximate result of the intentional violations committed by Defendants, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and mental anguish.

67.     Furthermore, as a direct and proximate result of such actions by Defendants, Plaintiff has been, is being, and will be in the future, deprived of income in the form of wages and of prospective benefits solely because of Defendants' conduct.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Enter judgment in Plaintiff's favor and against Defendants for their violations of Title VII;

B.  Award Plaintiff actual damages suffered, including lost wages, loss of fringe benefits and other damages;

C.  Award Plaintiff compensatory damages under Title VII for embarrassment, anxiety, humiliation and emotional distress Plaintiff has suffered and continues to suffer;

D.  Award Plaintiff back pay, liquidated damages, interest, front pay (or reinstatement), punitive damages, and any other damages allowed under Title VII

E.  Award Plaintiff prejudgment interest on her damages award;

F.  Award Plaintiff reasonable costs and attorneys' fees; and

G.  Grant Plaintiff such other and further relief, as this Court deems equitable and just.

## COUNT II:
## VIOLATION OF TITLE VII BY DEFENDANTS – RETALIATION

68.    Plaintiff repeats and re-alleges paragraphs 1 – 61 as if fully stated herein.

69.    Defendants' harassment of Plaintiff on account of her gender only worsened after Plaintiff complained about it.

70.    Because of the constant nature of the ongoing harassment and retaliation, Plaintiff was forced to resign, in what amounted to a constructive termination.

71.    Despite Plaintiff's repeated claims, Defendants took no remedial action to stop the ongoing harassment.

72.    Defendants' conduct and disregard for Plaintiff's continued complaints were motivated by intent to retaliate against Plaintiff for her protected activity under Title VII.

73.    Defendants willfully violated Title VII or acted with reckless disregard for whether their actions and the actions of their agents and employees were prohibited.

74.    As a direct and proximate result of the intentional violations by Defendants, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by Defendants, Plaintiff

has been, is being, and will be in the future, deprived of income in the form of wages and of prospective benefits solely because of Defendants' conduct.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Enter judgment in Plaintiff's favor and against Defendants for their violations of the anti-retaliatory provisions of Title VII;

B.  Award Plaintiff actual damages suffered, including lost wages, loss of fringe benefit and damages;

C.  Award Plaintiff compensatory damages under Title VII for embarrassment, anxiety, humiliation and emotional distress Plaintiff has suffered and continues to suffer;

D.  Award Plaintiff back pay, liquidated damages, interest, front pay (or reinstatement), punitive damages, and any other damages allowed under Title VII;

E.  Award Plaintiff prejudgment interest on her damages award;

F.  Award Plaintiff reasonable costs and attorneys' fees; and

G.  Grant Plaintiff such other and further relief, as this Court deems equitable and just.

**COUNT III:**
**VIOLATION OF THE FCRA –**
**HOSTILE WORK ENVIRONMENT**

75.    Plaintiff repeats and re-alleges paragraphs 1 – 61 as if fully stated herein.

76.    Plaintiff was subjected to hostile work environment because of her gender in violation of the FCRA, and because of such actions by Defendants, she has suffered irreparable injury and compensable damages unless and until this court grants relief.

77.     The unlawful employment practices complained of herein and the actions of Defendants and their agents, were willful, wanton, intentional and done with malice or with reckless indifference to Plaintiff's statutorily protected employment rights.

78.     As a direct and proximate result of the above-described actions of Defendants, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by Defendants, Plaintiff has been, is being, and will be in the future, deprived of income in the form of wages and of prospective benefits solely because of Defendants' conduct.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Enter judgment in Plaintiff's favor and against Defendants for their violations of the FCRA;

B.  Award Plaintiff actual damages suffered, including lost wages and loss of fringe benefits;

C.  Award compensatory damages for past, present, and future mental anguish, pain and suffering, and humiliation caused by Defendants' intentional discrimination, according to proof;

D.  Award punitive damages, according to proof;

E.  Award Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by the FCRA; and

F.  Order such other and further relief as the Court deems just and proper.

**COUNT IV:**
**VIOLATION OF THE FCRA –**
**RETALIATION**

79.     Plaintiff repeats and re-alleges paragraphs 1 – 61 as if fully stated herein.

80.     Defendants retaliated against Plaintiff in violation of the FCRA.

81.     Defendants' harassment of Plaintiff on account of her gender only worsened after Plaintiff complained about it.

82.     The unlawful employment practices complained of herein and the actions of Defendants and their agents were and are willful, wanton, intentional and done with malice or with reckless indifference to Plaintiff's statutorily protected employment rights.

83.     Because of such actions by Defendants, Plaintiff has suffered both irreparable injury and compensable damage unless and until this Court grants relief.

84.     As a direct and proximate result of the intentional retaliatory violations by Defendants, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and mental anguish. Furthermore, as a direct and proximate result of such actions by Defendants, Plaintiff has been, is being, and will be in the future, deprived of income in the form of wages and of prospective benefits solely because of Defendants' conduct.

**WHEREFORE**, Plaintiff, demands judgment against Defendants as follows:

A.  Enter judgment in Plaintiff's favor and against Defendants for their violations of anti-retaliatory provisions of the FCRA;

B.  Award Plaintiff actual damages suffered, including lost wages, loss of fringe benefits and damages;

C.  Award compensatory damages for past, present, and future mental anguish, pain and suffering, and humiliation caused by Defendants' intentional retaliatory actions, according to proof;

D.  Award punitive damages, according to proof;

E.  Award Plaintiff the costs of this action together with reasonable attorney's fees, as provided by the FCRA; and

F.  Order such other and further relief as the Court deems just and proper.

### G.  JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

DATED: January 9, 2020.

Respectfully submitted,

**R. Martin Saenz**
R. Martin Saenz (FBN: 0640166)
E-mail: msaenz@saenzanderson.com
**Yadhira Ramírez-Toro**
Yadhira Ramírez-Toro (FBN: 120506)
E-mail: yramirez@saenzanderson.com
SAENZ & ANDERSON, PLLC
20900 NE 30th Avenue, Ste. 800
Aventura, Florida 33180
Telephone: (305) 503-5131
Facsimile: (888) 270-5549
*Counsel for Plaintiff*